## JAMES BRANDON v. STATE.

[56 South. 165.]

HOMICIDE. *Dying declarations. Preliminary proof.*

A statement is not admissible in evidence as a dying declaration in the absence of testimony showing that the deceased had abandoned all hope of recovery.

APPEAL from the circuit court of Chickasaw county.
HON. W. A. ROANE, Judge.

James Brandon was convicted of manslaughter and appeals.

The facts are as follows:

On the trial what purported to be the dying declara-tion of the deceased was admitted as evidence over the objection of the defendant. The deceased was shot on Saturday night. Two days later he made a statement to the sheriff about the killing. He died on the eighth or ninth day after the shooting, of pneumonia, which

was contracted about the sixth or seventh day after he was shot. At the time he was shot he was very drunk. The doctor called upon him constantly during his sickness, and the first few days he stated to the doctor "that he was afraid of death," and that "he believed he was going to die," and according to the doctor's testimony he was excited about his condition, and said "he didn't believe he would get well," or words to that effect. About this time he made the statement to the deputy sheriff, which was admitted as his dying declaration. The defendant objected, on the ground that this declaration does not come within the rule as it does not show that he was "in extremis," or in fear of impending dissolution.

*A. T. Stovall,* for appellant.

I understand the rule to be that the court must know beyond every reasonable doubt that the declarant recognized that he was "in extremis;" in other words, made the statement under a sense of impending dissolution; conscious of the approach of death at the time of making the statement, and of its certainty. In other words, there must be no hope of recovery, and no longer any temporal, self serving purpose to be furthered, as evidently there was in this case. The declarant was justifying himself to the officers. He never said that he realized that he was going to die; but on the contrary the officers testified that he didn't even express any anxiety while they were there. The only time he ever said anything about dying was to the Doctor, the first few days of his sickness, when he was not over the effects of his drunk, and was feeling bad, and then he only said he was afraid he was going to die. After that he began to improve, and never to his wife or any member of his family did he express a belief that he was going to die; or tell them anything about how he was shot. Don't you know that, if he had realized that he was go-

99 Miss.—50

ing to die, and that death was certain, he would have said something to his family on the subject? Yet, he never said anything ot his family about dying; and he never said anything about how he was shot to anyone except the officers, and that was with a self-serving purpose; when he was making his statement to them in order that he might not be arrested and taken to jail. The officers never told him they were not going to do this; but simply demanded that he tell them how it happened. It wasn't a voluntary statement on his part. There was no one present except the officers, and the statement was made at their solicitation. He was afraid that if he confessed that he had had trouble with Rufus Horton, or had been drunk and supposed somebody was after him, the officers would arrest him; and so I say that this statement was entitled to no credence whatever, and should not have gone to the jury as a dying declaration or* otherwise in any view of this case.

*Jas. R. McDowell,* assistant attorney-general, for appellee. .

The question which is presented by the record is whether at the time of the making of this statement, he was conscious of approaching death. The books lay down a very strict rule of law which is elaborated in our state in the *Lipscomb case,* 75 Miss.

According to this rule "this must have been made under the realization and solemn sense of impending death." Counsel seemed to question whether the statements here were so made. It seems to me, however, that though he made no statements that he was conscious of approaching and impeiding death, yet from his actions and from what the doctor said, he evidently belived that he was going to die, though he might not have known it.

In this connection, I desire to quote from Wigmore (Wigmore on Evidence, vol. 2, sections 1439-1440, p.

1805): "As the guarantee consists of the subjective effect of the approach of death, is it essential that declarant should appear to have had a consciousness of the approach of death. . . This consciousness must of course have been at the time of the making of the declaration. It follows, on the other hand, that a subsequent change of this expectation of death, by the recurrence of a hope of life, does not render inadmissible a prior declaration made while the consciousness prevailed."

In the case here, the declarant was never heard to say that he had given up hope of recovery, or words to that effect, but it is evident that such was the gist of his statement. He had the witnesses to leave the room and insisted that his wife should go, for the evident reason, as the record discloses, that their relations were not the best in the world. In fact, she now appears for the defense. He was conscious; his utterances were those of a sane mind; they were concerning the tragedy; they were evidently made at a time when he believed that he was going to die.

Argued orally by *A. T. Stovall,* for appellant, and *J. R. McDowell,* assistant attorney-general, for appellee.

WHITFIELD, C.

The preliminary testimony introduced by the state to show that the deceased had abandoned all hope of recovering is far from being strong enough to meet the requirements of the law in that behalf, as repeatedly announced by this court.

It was therefore error, and fatal error, to admit the alleged dying declaration.

PER CURIAM. The above opinion is adopted as the opinion of the court, and, for the reasons therein set out, the case is reversed and remanded.

*Reversed and remanded.*